### UNITED STATES of America
### v.
### Rudolph CLEMONS, Appellant.
### No. 23577.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 15, 1970.

Decided May 14, 1971.

Petition for Rehearing Denied June 21, 1971.

**712**

Bazelon, Chief Judge, filed an opinion concurring in the result.

Mr. Michael Mulroney, Washington, D. C. (appointed by this Court), for appellant.

Mr. Kenneth M. Robinson, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, TAMM, Circuit Judge, and SMITH,* Chief Judge, U. S. District Court for the District of Montana.

TAMM, Circuit Judge:

Appellant was convicted by a jury on both counts of an indictment charging robbery and assault with a dangerous weapon.[1] Though we have carefully considered all the arguments made by appellant, we affirm the convictions.

In the early-morning hours of November 16, 1968, Edward R. Gordon, the night manager of a gasoline station, was robbed at gunpoint of $68. That same morning, when Mr. Gordon was summoned to the police station, he selected from a book of about 30 photographs[2] appellant's picture as representing the man who had held him up. On December 10, 1968, Mr. Gordon again picked out the appellant—this time from a properly held lineup of eight men. At the trial Mr. Gordon once more identified the appellant as the man who had robbed him at gunpoint.

The appellant's main objections on appeal find their origin in the picture identification made by the complaining witness on the morning of the crime. Specifically, appellant objects to any mention to the jury of his being identified by Mr. Gordon from pictures that had been gathered by the police. Appellant claims that any such reference is improper since it would indicate to any reasonably alert juror that "appellant at least had a prior arrest record and probably a criminal record." (Brief

* Sitting by designation pursuant to 28 U.S.C. § 292(c) (1964).

1. D.C.Code §§ 22-2901, 22-502 (1967).

2. Though the photographs were of people with prior records, they were not of the typical "mug shot" variety.

for Appellant at 10.) The appellant's second claim of trial error deals with the possibility of irretrievable suggestivity encompassing the process of selecting appellant's picture.

We will first discuss the problem of the prosecution's reference to the photographic identification. In Barnes v. United States, 124 U.S.App.D.C. 318, 365 F.2d 509 (1966), it was held that the showing of a "mug shot" photograph of the defendant to the jury was prejudicial error, since there was thus produced a strong inference of a prior criminal record. The court in *Barnes*, however, found no fault with the introduction into evidence of a full-length snapshot of an ordinary nature. In our case the prosecutor, while relating the events leading to appellant's identification, mentioned in his opening statement that the "detective * * * got together a group of polaroid color film." (Transcript of Government's Opening Statement at 7.) If the Government is allowed to elicit the photographic identification in presenting its case, then there is, of course, no reason why the jury may not be treated to a preview of the prosecutor's strategy. The prosecution strategy is usually to buttress the complaining witness's in-court identification by calling forth from the witness's memory the circumstances of any prior identification. This has been a proper and strategically sound tactic for years. The photo was described to the jury as a "polaroid color film" (*Id.*) and not as a "mug shot" such as the one that gave the court trouble in *Barnes*.[3] Since the prosecutor's examination of his witness was not only skillful but legally faultless, we find no impropriety in the opening statement preview he gave to the jury. If we are to grant prosecutors any devices with which to buttress an in-court identification, then

we must permit the method employed here.

We now devote our attention to appellant's second contention, *i. e.*, the possibility of suggestivity in the process of selecting appellant's picture. It must be admitted that there is always a danger of misidentification of a defendant from a photograph viewed by an excited and sometimes angry victim of crime. This danger exists, though to a lesser degree, even when the police employ the most stringent of safeguards. With regard to this problem the Supreme Court in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) said:

Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement * * *. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was *so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.* (*Id.* at 384, 88 S.Ct. at 971) (Emphasis added.) The facts in our case indicate very little chance of misidentification either at the time of the photographic identification or at any other stage. The robbery took place in the office of a gasoline station. The lighting condi-

---

3. Though we do not think it necessary for the disposition of this issue, the picture was available to defense counsel in the event he wished to show it to the jury to clear up any doubts he may have thought they had as to whether such picture was in reality a typical "mug shot." He could also, of course, have cleared up any such doubts on cross-examination. He chose to do neither.

tions were described as excellent by the complaining witness, who said he had a "good" look at appellant's face for at least one full minute. That same morning the complaining witness was called to the police station to view, by himself, a book of photographs. He testified the book contained approximately 30 color photographs of Negro males, 10 of whom were the same age as appellant.[4] Most of them, he said, were taken of the subjects in the same pose. The testimony of Detective Robert P. Jones, who investigated the robbery, was substantially the same. In short, there is absolutely nothing in the record to indicate any irregularity in the selection process. With these facts in mind, it is, indeed, quite unlikely that the complaining witness singled out from the pictures a photograph of an innocent man.

Appellant, however, further argues that since the array of photos from which the complaining witness selected cannot be reproduced,[5] the photographic identification cannot be allowed. There being no hint of a lack of procedural due process in the selecting of the photograph involved, this inability to regroup the photographs certainly does not make the photographic identification invalid.[6] Admittedly, it might have been a better procedure if the Police De-

partment had kept a record of all such pictorial arrays. See United States v. Hamilton, 137 U.S.App.D.C. 89, 92, 420 F.2d 1292, 1295 (1969). It would have been a step closer to achieving the ideal of absolute certainty when judging the propriety of photographic identifications. As long as the requirements of due process are met, however, we are unable to say there was an abuse of the trial judge's discretion in allowing the identification testimony into evidence. See Simmons v. United States, *supra*, 390 U.S. at 386, 88 S.Ct. 967. Assuming, without deciding, the right of this court to establish a rigid rule providing the manner in which the Police Department shall maintain its files for future cases, we find, in light of recent commendable police regulations,[7] no reason to issue such a mandate.

Affirmed.

BAZELON, Chief Judge (concurring in the result):

Appellant argues that a photographic identification should not be allowed into evidence when the array of photographs shown the witness cannot be reassembled. I think that the court, in dismissing this argument, pays insufficient heed to our recent decision in United

---

4. *See* United States v. Hamilton, 137 U.S. App.D.C. 89, 91, 420 F.2d 1292, 1294 (1969), where there was only "15 photographs in all, depicting males of various ages."

5. Apparently, at the time appellant's picture was selected all photos were arranged alphabetically. Since then, however, they have been reassembled into books according to age, thereby making impossible an actual reproduction of the group of photos the witness viewed.

6. After this case was tried but before it was argued in this court, we set forth a rule in United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971), requiring the Government to establish methods of preserving all discoverable evidence gathered in the course of a criminal investigation. Since the rule laid down in *Bryant* dealing with the preservation of evidence was meant to influence only *fu-*

*ture* Government conduct (439 F.2d at 652) and since our facts relate not to any loss but solely to inability to reassemble with no showing of bad faith, we see no need to discuss the bearing *Bryant* might have on the facts of this case.

7. Memorandum Order No. 16 (May 15, 1970) of the Metropolitan Police Department provides in section II (2):

Adequate records of the photographs shown to each witness must be kept so that the exact group of photographs from which an identification was made can be presented in court at a later date to counter any claim of undue suggestion and enhance the reliability of the in-court identification. This information shall be recorded in the statement of facts of the case.

We have not been informed of any failure on the part of the police to follow its own regulation.

States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971).

## I

In *Bryant* a unanimous panel of this court held that the Government's duty to disclose relevant evidence upon request implied a duty to preserve the evidence. That case concerned a tape-recording of a narcotics transaction between appellant and a government undercover agent. This tape was obviously a critical piece of evidence for the defense to examine before trial, but their efforts to discover it, under Rule 16, were unavailing. A few days before trial, the Government finally admitted that the tape had been unaccountably lost.

The *Bryant* court examined the Supreme Court's recent decision in United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), and concluded that

> criminal convictions otherwise based on sufficient evidence may be permitted to stand so long as the Government made "earnest efforts" to preserve crucial materials and to find them once a discovery request is made.[1]

How indeed can we guarantee a fair trial if we fail to concern ourselves with the evidence which will permit us to determine *whether* defendant has received a fair trial? For the future, the *Bryant* court went on to say, "earnest efforts" will be defined quite strictly.

> [W]e hold that sanctions for nondisclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve *all* discoverable evidence gathered in the course of a criminal investigation.[2]

This holding is directly in point for this case. If the Police Department had not already promulgated Memorandum Order No. 16, quoted in footnote 7 of the court's opinion, we would have the authority to require them to do so, on pain of having subsequent convictions based on missing photographic arrays reversed. In fact, that step has already been taken in *Bryant*, since that case refers to *all* discoverable evidence. The Police Department should be placed on notice that promulgation of Memorandum Order No. 16 is not alone sufficient to satisfy due process standards. As the above quote from *Bryant* makes clear, good faith efforts to follow and enforce the regulation are required as well.

## II

Granted that these arrays must be produced in the future, what about this particular case?

The court in *Bryant* noted that the loss of the tapes fell on a spectrum between bad faith suppression and good faith loss. It remanded the case to the District Court with instructions that it should

> weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice.[3]

The court in this case has a manifest obligation to determine whether a similar remedy is appropriate here.

This is a different case from *Bryant* and *Augenblick*, where it seemed out of the ordinary for the tapes to be unavailable. That is, it seemed clear that the tapes, ordinarily preserved, had been "lost." The question in those cases was the degree of fault. Here, it cannot be said that the photographs were "lost." We may take judicial notice that until Memorandum Order No. 16 it was not the practice of the Police Department to keep records of the photographs which had been shown to witnesses. In this

---

1. 439 F.2d at 651.

2. Id. [Italics in original.]

3. 439 F.2d at 653.

case, therefore, there seems to be no need for a remand for further findings of fact.

That records of photographic arrays were never routinely kept does not, of course, insulate the practice from retrospective review. We are dealing here not with a prophylactic rule designed to discourage police misconduct which abridges the rights of individuals in a manner unrelated to their guilt or innocence; fair identification procedures must be the cornerstone of any minimally just criminal system. On the other hand, we cannot ignore the fact that retroactive application of a preservation requirement would have a substantial impact on the administration of the criminal laws, and that law enforcement officials were relying on long-standing judicial acquiescence in the procedures attacked today. Such considerations persuaded the Supreme Court not to make the *Wade* rule retroactive,[4] and I feel bound by this rationale to apply the strict requirements of *Bryant* only prospectively. I therefore concur in the result in this case.

---

4. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).